1
2
3
4
5

Mark Schlachet (OSB 0009881) [Admitted PHV]
markschlachet@me.com
3515 Severn Road
Cleveland, Ohio 44118
Tel: (216)225-7559 Fax: (216)932-5390
*Attorney for Defendants*

6
7
8
9
10

Christopher J. Hammond (SBN 150024)
chammond@bizlawpro.com
21540 Prairie Street, Unit A
Chatsworth, CA 91311
Tel: (866)625-2529 Fax: (866)463-9285
*Local Counsel for Defendants*

11

## IN THE UNITED STATES DISTRICT COURT

12

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14
15
16
17
18
19
20
21
22
23
24
25
26

| | |
|---|---|
| TP-LINK USA CORPORATION,<br>Plaintiff,<br>v.<br><br>ADAM & SORA STARKE,<br>Defendants,<br>and<br>CAREFUL SHOPPER, LLC, *et al.*<br>Defendant-Counterclaimant-<br>Third-Party Plaintiff,<br><br>v.<br><br>TP-LINK NORTH AMERICA INC,<br>and<br>AUCTION BROTHERS, INC.<br>dba AMAZZIA,<br>Third-Party Defendants. | CASE NO:  8:19-cv-00082-JLS-KES<br><br>**CAREFUL SHOPPER'S BRIEF IN OPPOSITION TO TP-LINK'S NOTICE OF MOTION AND MOTION TO FIX ATTORNEYS FEES AND COSTS IN CONNECTION WITH MOTION TO STRIKE (ECF 92)**<br><br>[*Filed concurrently with Declaration of Mark Schlachet]*]<br><br>Hearing Date: TBD<br>Hearing Time: TBD<br>Courtroom: 10A<br>Complaint filed: January 15, 2019 |

27
28

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................. 1

II.     TP-LINK/AMAZZIA'S ANTI-SLAPP MOTION AND PROCEEDINGS
        THEREON ......................................................................... 4

        A. Making a Prima Facie Showing ........................................ 4

        B. Careful Shopper's Efforts to Secure the At-Issue Communications .......... 5

        C. A Surprise Witness ..................................................... 6

        D. "Special Circumstances" Can Reduce or Eliminate Compensation .......... 8

III.    THE REVELATIONS FROM MR. FIKHMAN'S DEPOSITION PRESENT
        A "SPECIAL CIRCUMSTANCE" PER *KETCHUM* ....................... 9

IV.     UNNECESSARY & UNREASONABLE .................................... 10

        A. Case in Point: TP-Link's Unnecessary Stay Motion ................. 10

        B. Discussion of TP-Link's Fee Application ......................... 14

            1. Applicable Law ................................................... 14

            2. Scope of Compensability ....................................... 15

            3. Critique of TP-Link Timesheet ................................. 17

V.      TP-LINK'S ATTACK ON OPPOSING COUNSEL .................... 20

CONCLUSION .......................................................................... 23

Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees

# TABLE OF AUTHORITIES

## Cases

*Bittaker v. Woodford*, 331 F.3d at 719 ........................................................8

*Careful Shopper, LLC v. TP- Link USA Corp., et al.*, No. 1:18-cv-03019-RJD-RML (E.D.N.Y. 2018) ........................................................1

*Century Sur. Co. v. Prince*, 782 F. App'x 553, 558 (9th Cir. 2019)..........................16

*Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) .....................8

*Christie v. Lester*, 2015 U.S. Dist. LEXIS 189810 at *7 (C.D. Cal. 2015) ........16, 18

*Dickinson v. Cosby*, 17 Cal. App. 5th 655, 683, 225 Cal. Rptr. 3d 430, 455 (2017)..4

*Dynabursky v. Alliedbarton Sec. Servs., LP*, No. SACV 12-2210-JLS (RNBx), 2016 U.S. Dist. LEXIS 194274, at *23 (C.D. Cal. Aug. 15, 2016)..................................5

*Edwards v. Centex Real Estate Corp.*, 53 Cal. App. 4th 15, 34-35, 61 Cal. Rptr. 2d 518, 530 (1997) ........................................................4

*Frisby v. Schultz*, 487 U.S. 474, 490, 108 S. Ct. 2495, 2505 (1988) ........................5

*Graham-Sult v. Clainos*, 756 F.3d 724 (9th Cir. Feb. 5, 2014)................................15

*Grant & Eisenhofer, P.A. v. Brown*, 2018 U.S. Dist. LEXIS 227454, at *2-3 (C.D. Cal. 2018) ........................................................15, 18

*In re 60 E. 80th St.*, 218 F.3d 109, 117 (2d Cir. 2000)............................................23

*In re Taco Bell Wage & Hour Actions*, 222 F. Supp. 3d 813, 830 (E.D. Cal. 2016)..9

*Kajeet, Inc. v. Qustodio, LLC*, 2019 U.S. Dist. LEXIS 228068 *12 (C.D. Cal. 2019) ........................................................16, 17, 23

*Keith H. v. Long Beach Unified Sch. Dist.*, 228 F.R.D. 652, 657 (C.D. Cal. 2005) ...4

*Ketchum v. Moses*, 24 Cal. 4th 1122, 1138, 104 Cal. Rptr. 2d 377, 17 P.3d 735 (2001) ........................................................8, 14, 17, 20

*Leavitt v. Int'l Paper Co.*, 2015 U.S. Dist. LEXIS 6924, at *7 (C.D. Cal. 2015) .......9

*Lightbourne v. Printroom Inc.*, No. SACV 13-876-JLS (RNBx), 2015 U.S. Dist. LEXIS 193034, at *26-27 (C.D. Cal. Dec. 10, 2015)............................................2

*Mireskandari v. Daily Mail Gen. Tr. PLC*, 2014 U.S. Dist. LEXIS 201202, at *33-36 (C.D. Cal. 2014) ........................................................14, 15

*Mireskandari v. Daily Mail*, 2013 U.S. Dist. LEXIS 199145, at *8 (C.D. Cal. Jan. 14, 2013)........................................................1, 3

Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) ........................21

*Okada v. Whitehead*, No. 8:15-cv-01449-JLS-KESx, 2017 U.S. Dist. LEXIS 169147, at *6 (C.D. Cal., 2017) ...................................................................4

*P6 LA MF Holdings SPE, LLC v. Shekhter*, 2017 U.S. Dist. LEXIS 220299 ...........4

*Premier Medical Mgmt. Systems, Inc. v. Cal. Ins. Guarantee Ass'n*, 163 Cal. App. 4th 550, 564, 77 Cal. Rptr. 3d 695 (2008) ...........................................................14

*Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) ........................................................................................................................3

*Safeco Ins. Co. of America v. Rawstrom,* 183 F.R.D. 668, 671-72 (C.D. Cal. 1998) .4

*Sentinel Offender Servs., LLC v. G4S Secure Sols. United States, Inc.*, 2017 U.S. Dist. LEXIS 181958, at *21 (C.D. Cal. 2017) ......................................................14

*Serrano v. Unruh*, 32 Cal.3d 621, 635, 186 Cal. Rptr. 754, 652 P.2d 985 (1982)......3

*Solu-Med, Inc. v. Youngblood Skin Care Products, Inc.,* Case No. 19-cv-60487 (S.D. FL) ............................................................................................................................6

*Sparling v. Bank of Am. Bus. Lending Servs.*, 2018 U.S. Dist. LEXIS 226087, at *8-9 (C.D. Cal. 2018) .....................................................................................................16

*Starke v. SquareTrade, Inc.* No. 1:16-cv-07036- NGG (E.D.N.Y) ..........................21

*Taylor v. Illinois*, 484 U.S. 400, 401, 108 S. Ct. 646, 649 (1988) .............................7

*Thimes Solutions, Inc. v. TP-Link USA Corporation, et al*, Case 2:19-cv-10374-PA-E ..................................................................................................................................7

*Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1328-29 (11th Cir. 2002)........23

*Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019) ..................................22

**Statutes**

Code of Civil Procedure § 425.16(c)(1) ............................................................14, 15

**Rules**

L.R. 83-3.1.2 ..................................................................................................................22

L.R. 7-2 ..........................................................................................................................19

L.R. 7-3 ...........................................................................................................10, 12, 13

Cal. Rules of Professional Conduct, rule 3.1(a)(2) ......................................................8

Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees

## I.    OVERVIEW

Careful Shopper originally brought suit against TP-Link in the Eastern District of New York on May 22, 2018. *Careful Shopper, LLC v. TP- Link USA Corp., et al.*, No. 1:18-cv-03019-RJD-RML (E.D.N.Y. 2018). TP-Link then initiated the instant action on January 15, 2019, joining Careful Shopper's managing member and his wife (the "Starke defendants") along with Careful Shopper itself.  The parties filed their joint Rule 26(f) Report on November 1, 2019 (ECF 34).  Careful Shopper contributed: "**Consideration of Anticipated Counterclaims in Case Management.**"(*Id.* at p. 6). Thus advised, TP-Link responded: "[i]f Defendants file any counterclaims, Plaintiff may file a motion to dismiss,"  (*Id.* at p. 8) but TP-Link did not disclose any contemplation of filing an anti-SLAPP motion.

Had TP-Link disclosed a contemplated anti-SLAPP motion, the litigation would have taken far less resource-intensive directions.  Discovery would have been stayed because "denying a stay would risk defeating the purpose of anti-SLAPP immunity." *Mireskandari v. Daily Mail*, 2013 U.S. Dist. LEXIS 199145, at *8 (C.D. Cal. Jan. 14, 2013). As shown above, Careful Shopper *did* disclose its intent to file the counterclaims in the Rule 26(f) Report; and TP-Link *did* report therein its intent to file a motion to dismiss. Why didn't TP-Link also disclose November 1, 2019 that it *may* file an anti-SLAPP motion, importing a stay of discovery?  Or on November 12, 2019 when it was served with the counterclaims?

Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees

Careful Shopper filed its Answer and Counterclaims/Third Party Complaint on November 12, 2019. Defendants Starke answered the complaint but *did not* counterclaim or third-party complain against TP-Link or Amazzia.[1]  Hence, defendants Starke may *not* be held liable for anti-SLAPP attorney fees. Cf. *Lightbourne v. Printroom Inc.*, No. SACV 13-876-JLS (RNBx), 2015 U.S. Dist. LEXIS 193034, at *26-27 (C.D. Cal. Dec. 10, 2015).[2]

The parties served Rule 34 Requests on or about November 18, 2019. TP-Link did not disclose its intent to file an anti-SLAPP motion until December 19, 2019. TP-Link did not indicate to Careful Shopper, at any time prior to January 7,

---

[1] TP-Link's Motion to Strike and/or Dismiss was addressed only to Careful Shopper. The first sentence of its supporting memorandum reads: "Careful Shopper's Amended Counterclaims and Third-Party Complaint ("ACC"), ECF No. 54, seek damages for TP-Link USA Corporation and TP-Link North America, Inc.'s (together, "TP-Link") exercise of their constitutionally and statutorily protected rights."  See ECF 62 at p.1.  This single mention of defendants Starke merely recites their role as defendants in the underlying complaint. *Id.*

[2] The court, we believe inadvertently, identified defendants Starke  as counterclaimants in ECF 82, p.1: "[b]efore the Court is Plaintiff and Counter Defendant TP Link's Motion to Strike or Dismiss the counterclaims asserted by Defendants and Counterclaimants Careful Shopper, LLC, Sora Starke, and Adam Starke."   And at *id.,* p.6n.6 the court stated: "For the purposes of this Motion, Defendants and Counterclaimants Careful Shopper, LLC, Sora Starke, and Adam Starke stand in the proverbial "shoes" of a plaintiff asserting claims challenged via an anti-SLAPP motion."  TP-Link has submitted a proposed order which embraces defendants Starke, contrary to what we believe would be the court's intent, now having been advised of the apparent inadvertence.

Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees

2020, any interest is staying discovery. By that time Careful Shopper had produced 12,717 documents, a privilege log, and numerous proposed protective orders. During dozens of substantive interactions, no indication of an anti-SLAPP motion.

On January 17, 2020 TP-Link filed its Motion to Strike and/or Dismiss. ECF 62. The court in ECF 82 struck Careful Shopper's state law counterclaims and granted TP-Link leave to file an application for compensation.  On April 20, 2020 TP-Link filed its application for $122,849.50 covering all (non-antitrust related) hours in the case since November 12, 2019.

It is Careful Shopper's strong belief that the instant fee application for $122,849.50 runs afoul of *Mireskandari v. Daily Mail Gen. Tr. PLC*,  2014 U.S. Dist. LEXIS 201202, at *7 (C.D. Cal. 2014)("counsel may not leverage the statute to obtain an 'unjust' award. *Serrano v. Unruh*, 32 Cal.3d 621, 635, 186 Cal. Rptr. 754, 652 P.2d 985 (1982))."  TP-Link in our view—as we will attempt to establish—executed a strategy of scorched earth,[3] maximum litigation, rendering at

_____

[3] TP-Link counsel has threatened Rule 11 and other sanctions no fewer than 10 times in this litigation. One episode, which TP-Link mischaracterizes at Mem. (ECF 92) p.5, saw TP-Link confrontationally threaten Local Counsel James Shah that it, TP-Link, would advise Judge Staton that such local counsel was taking *his client* Careful Shopper's position that relevancy objections to Rule 34 requests are waived if not timely raised.  This is what TP-Link now represents to the court as undersigned's "positions so far outside what is considered appropriate." Undersigned was and is correct, i.e. in Judge Staton's and Magistrate-Judge Scott's courtrooms, unraised objections (aside from privilege) are waived. See *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992);  *Okada v. Whitehead*, No. 8:15-cv-01449-JLS-KESx, 2017 U.S. Dist. LEXIS 169147, at *6

most $16,333.20 of its fee application compensable.

## II. TP-LINK/AMAZZIA'S ANTI-SLAPP MOTION AND PROCEEDINGS THEREON

### A. Making a Prima Facie Showing

In its brief in support of the anti-SLAPP privilege, TP-Link/Amazzia argued that the moving party's burden is "only to make a prima facie showing of protected activity, which is 'not an onerous one.'"  ECF 62 at p. 6.  Part of that burden was to demonstrate a "contemplated litigation in good faith and under serious consideration."[4] The same or similar requirement obtains as to the California Litigation Privilege.  *Edwards v. Centex Real Estate Corp.*, 53 Cal. App. 4th 15, 34-35, 61 Cal. Rptr. 2d 518, 530 (1997).

TP-Link/Amazzia's non-onerous showing was based in critical measure upon TP-Link counsel's  representation that "[a]t-issue pre-suit communications with Amazon were unquestionably in furtherance of TP-Link's litigation conduct."  ECF 62 at p. 10. This was the only support in ECF 62 or ECF 78 addressing the

_____

(C.D. Cal., 2017)  The rule applies specifically to relevancy objections. *Keith H. v. Long Beach Unified Sch. Dist.*, 228 F.R.D. 652, 657 (C.D. Cal. 2005) ; *Safeco Ins. Co. of America v. Rawstrom,* 183 F.R.D. 668, 671-72 (C.D. Cal. 1998).  TP-Link doggedly insisted on raising, and directing discussion to,  relevance objections for the first time at the Local Rule 7-3 conference. Mr. Shaw became unnerved when threatened with an ill-founded assault on his and his firm's reputation and credibility.

[4] *P6 LA MF Holdings SPE, LLC v. Shekhter*, 2017 U.S. Dist. LEXIS 220299, at *38 (C.D. Cal. 2017);  *Dickinson v. Cosby*, 17 Cal. App. 5th 655, 683, 225 Cal. Rptr. 3d 430, 455 (2017).

"litigation conduct" prerequisite to "protected activity." [5]  This court expressed an

uneasiness in that the "exact language of those communications is not in the record."

ECF 82 at p. 12.  The court nevertheless found that TP-Link/Amazzia had made

their *prima facie* showing for "protected activity," we believe, based materially

upon a position of counsel not warranted under existing law.

### B. Careful Shopper's Efforts to Secure the At-Issue Communications

Careful Shopper commenced discovery on or about November 18, 2019,

following the Rule 26(f) conference, requesting "[a]ll documents from Amazzia

concerning the reporting of non-complaint sellers to Amazon." TP-Link responded:

"TP-Link objects to this Request as vague, overbroad, unduly burdensome, and

ambiguous, especially in its use of the phrase "concerning the reporting of non-

compliant sellers to Amazon." Careful Shopper also requested "[a]ll documents

concerning the IP Complaints lodged with Amazon on or about March 31, 2018 and

April 9, 2018 with the following complaint ID numbers: 1574766671, 1574766551,

and 1594857291."  TP-Link responded as follows: "TP-Link objects to this Request

---

[5] Counsel's representations can play an important role in judicial decision-making.
The Supreme Court relies upon them on occasion.  See *Frisby v. Schultz*, 487 U.S.
474, 490, 108 S. Ct. 2495, 2505 (1988)(" The Court endorses a narrow construction
of the ordinance by relying on the town counsel's representations.")  See
*Dynabursky v. Alliedbarton Sec. Servs., LP*, No. SACV 12-2210-JLS (RNBx), 2016
U.S. Dist. LEXIS 194274, at *23 (C.D. Cal. Aug. 15, 2016)(" Based on
Class Counsel's representations, and in light of the size of the class . . . the Court
concludes . . . .").

as vague, overbroad, unduly burdensome, and ambiguous, especially in its use of the

phrase "[a]ll documents concerning the IP Complaints lodged with Amazon."  TP-

Link produced zero responsive documents As stipulated in ECF 66, p.5: "Careful

Shopper [promptly began] the process to compel discovery responses from TP-Link

under Local Rule 37."

### C. A Surprise Witness

Subsequent to this court's anti-SLAPP ruling on March 23, 2020 (ECF 82),

Careful Shopper learned of the March 6, 2020 transcript of William Fikhman. See

Deposition of William Fikhman in  *Solu-Med, Inc. v. Youngblood Skin Care*

*Products, Inc.,* Case No. 19-cv-60487 (S.D. FL) at ECF 107-1 (referred to as "F.

Dep." and annexed hereto in relevant part as Exhibit 1 ).  See S. Dec. at ¶3.  Mr.

Fikhman was deposed as the Amazzia "person most knowledgeable" on December

10, 2019. F. Dep. at 9:14-25.

Mr. Fikhman identified and authenticated a certain writing (Exhibit 2 hereto,

see S. Dec. at ¶4), as "verbiage that may have been used when we submit a

complaint to Amazon."  See F. Dep. at 86:13-87:8. Mr. Fikhman affirmed that

Amazzia created the language. *Id.* at 88:7-11. This was the first discovery of actual

IP counterfeit complaint language utilized by Amazzia. Mr. Fikhman also testified

that "all of our reporting processes are actually very methodical and organized and

strategic" (*Id.*  at 54:5-6) This verbiage was used during the 2018 timeframe at suit.

See *Thimes,* cited *infra*, at ECF 102-1, p.3 at ¶4. This language does not evidence—does not hint at-- "contemplated litigation in good faith and under serious consideration."

It is unlikely that the communications for which TP-Link/Amazzia sought anti-SLAPP/California Litigation Privilege protection herein were not identical or similar to the above-quoted Amazzia language sent to Amazon vis-à-vis Youngblood Skin Care Products. As Mr. Fikhman testified: Amazzia reporting was "methodical and organized and strategic." We annex the relevant document as Exhibit 2.

Mr. Fikhman would later, on March 30, 2020, file a wholly inconsistent declaration before Judge Anderson in the related litigation of *Thimes Solutions, Inc. v. TP-Link USA Corporation, et al*, Case 2:19-cv-10374-PA-E, ECF 101-2, Exhibit 3 hereto. See ECF 88 at p.2n.2. **Importantly, neither Amazzia's real time, recorded 2018 language nor its newfound, recollected "bundle of rights" language, contains a hint of contemplated litigation, let alone good faith contemplation of litigation. Two sets of verbiage without a hint of litigation.**

When a "surprise witness" such as Mr. Fikhman contradicted counsel's representations, "the appropriate sanction was to exclude that testimony." *Taylor v. Illinois*, 484 U.S. 400, 401, 108 S. Ct. 646, 649 (1988). By excluding TP-Link counsel's "litigation conduct" representation here, TP-Link/Amazzia's argument for

good faith contemplation of litigation fails the *prima facie* test. By failing the *prima facie* test TP-Link, in all equity, is not entitled to be compensated as the prevailing anti-SLAPP movant.  See Motion for Reconsideration, ECF 88.

It was fundamentally unfair for TP-Link and Amazzia, a co-movant, to withhold its "verbiage that may have been used when we submit a complaint to Amazon."  Arguments and representations to achieve unjust results were made feasible because discovery obligations were trampled and this court's Local Rules were weaponized.[6]  The privilege was used 'both as a sword and a shield.'" *Bittaker*, 331 F.3d at 719 (quoting *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).  *Cf. Adkins v. Wells Fargo Bank, N.A.*, 2011 U.S. Dist. LEXIS 170001, at *4 (C.D. Cal. 2011) ("The Court is particularly troubled . . . .")

### D. "Special Circumstances" Can Reduce or Eliminate Compensation

It is well-established that "[t]o the extent a trial court is concerned that a particular award is excessive, it has broad discretion to adjust the fee downward or deny an unreasonable fee altogether." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1138, 104 Cal. Rptr. 2d 377, 17 P.3d 735 (2001).  California law recognizes "special circumstances" warranting the reduction or denial of even mandatory, statutory attorney fees. *In re Taco Bell Wage & Hour Actions*, 222 F. Supp. 3d 813, 830 (E.D.

---

[6] Under Rule 3.1(a)(2) of the California Rules of Professional Conduct a lawyer is prohibited from "present[ing] a claim or defense in litigation that is not warranted under existing law."  It appears (see *Neeville, Sparrow* and Exhibit 2 hereto) that the "litigation activity" representation was not warranted by existing law.

Cal. 2016).

TP-Link pursued a coherent strategy to proliferate as much litigation as possible until the deadline to the anti-SLAPP motion drew near. TP-Link concealed its intent to bring an anti-SLAPP motion in the Rule 26(f) report,[7] thereby fomenting discovery and the full implementation of Local Rule 37 procedures,  unnecessarily spent approximately 43.7 hours in "litigating" a motion  to stay discovery (see below), and waited until the clock had run for 48 days (from November 1-December 19) to announce its contemplation of an anti-SLAPP initiative.

### III.    THE REVELATIONS FROM MR. FIKHMAN'S DEPOSITION PRESENT A "SPECIAL CIRCUMSTANCE" PER *KETCHUM*

Worst of all in TP-Link's high-powered arsenal was the representation to this court that the "at-issue pre-suit communications with Amazon were unquestionably in furtherance of TP-Link's litigation conduct." That representation was false, pivotal, and demands accountability.  It had no place in TP-Link/Amazzia's brief.

The instant case is similar to *Leavitt v. Int'l Paper Co.*, 2015 U.S. Dist. LEXIS 6924, at *7 (C.D. Cal. 2015), a Rule 11 case, where counsel's false

---

[7] When this case was ripe for Rule 26(f) conference, TP-Link surprisingly sought to avoid an actual conference, deferring to an exchange of case management documents. The assigned reason for this departure from rule was: "[w]e want to avoid a repeat of our previous conferences, which have been little more than Careful Shopper spending an unreasonable amount of time pressing irrelevant and/or legally dubious positions."  Undersigned responded on October 27th: "I would not dare appear before Judge Staton not having personally conferred." And so it was... but with no mention of a contemplated anti-SLAPP motion.

representation to the court drew the following language from Judge Otis Wright II: "[n]ot only is counsel's representation false, but the request for sanctions only adds to the egregious nature of the motion."  TP-Link/Amazzia's stated position ("unquestionably in furtherance of litigation conduct") is contradicted by Mr. Fikhman's subsequent testimony and  TP-Link now magnifies the egregiousness of its misrepresentation by seeking fees for all hours in the case since November 12, 2019.  TP-Link accepts no responsibility.

## IV.  UNNECESSARY & UNREASONABLE

### A. Case in Point: TP-Link's Unnecessary Stay Motion

Upon December 19, 2019 notice to Careful Shopper of an anticipated anti-SLAPP motion, Careful Shopper counsel had a knee-jerk reaction, that same day, that discovery must continue.  TP-Link uses that day's knee-jerk reaction to argue that Careful Shopper is responsible for wasteful litigation respecting which TP-Link seeks compensation.  But the question is not what undersigned exclaimed in utter surprise on 19 December; rather, the question is why TP-Link waited until December 19th to disclose a coming anti-SLAPP motion; until January 7th to half-heartedly suggest a stay motion; and until January 21, 2020 to state an intent in earnest to file a stay motion.  If TP-Link viewed counsel's knee-jerk as a genuine statement of position . . . why did it not immediately demand a Local Rule 7-3 conference on the issue, on December 19th, and communicate its grounds for a stay?

Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees

On January 21, 2020 at 4:50 PM TP-Link counsel advised undersigned that TP-Link *intended* to file a motion to stay discovery proceedings pending decision on the anti-SLAPP motion: "As discussed during our January 9 conference, we intend to file a motion to stay discovery as to the claims asserted in the amended counterclaims pending resolution of the motion to strike/dismiss."  At 5:13 PM undersigned advised TP-Link counsel: "Let me get back to you tomorrow."  At 9:54 a.m. the next morning undersigned researched TP-Link's request for a stay, mindful of (i) this court's practice to independently assess stipulations to stay, and (ii) the consequences under Local Rules, procedures and case law of lacking due diligence. Counsel's real time file log indicates a research session that lasted 18 minutes or so until about 10:12 a.m., and yielded four (4) cases indicating that CDCA would generally stay discovery under the existing circumstances in antitrust and anti-SLAPP situations:

| Stay of Discovery | Jan 22, 2020 at 10:12 AM |
|---|---|
| • BAC Home Loan Servicing, LP v. Advanced Funding Strategy at 9:54 AM | Jan 22, 2020 |
| • Mireskandari v. Daily Mail, 2013 U.S. Dist. LEXIS 199145 at 10:12 AM | Jan 22, 2020 |
| • Skellerup Indus v. City of Los Angeles, 163 F.R.D. 598 at 9:58 AM | Jan 22, 2020 |
| • Vista Del Sol Health Care Servs. V. NLRB, 2014 U.S. Dis at 10:07 AM | Jan 22, 2020 |

(See copy of actual document log, Exhibit 4 hereto)

At 10:16 a.m. on January 22, 2020 undersigned wrote to TP-Link counsel as

follows:

> I have done some poking around into motions to stay discovery in the CDCA. It does appear that TP-Link has substantial grounds to obtain a stay. Let's work this one out and not put you, us or the court to needless expense.

> As the court can see, Careful Shopper ascertained within 18 minutes, "first thing in the morning," that the parties should jointly seek a stay of discovery proceedings and so advised TP-Link counsel within minutes thereafter. Unfortunately, TP-Link had done a great deal of unnecessary work on a Motion to Stay, from January 7-9, 2020, 10.4 hours *before* ever mentioning a stay motion, and then for three days from January 19-21, 2020, before advising undersigned of its *intent* to file such a motion. Incredibly, TP-Link seeks compensation for preparing a motion to stay discovery for 43.7 hours-- $17,767.50.

> Staggering! Indeed, 10.4 hours were expended before even requesting a Local Rule 7-3 conference. Whereas Careful Shopper was able to identify four (4) cases of decisive import in 18 minutes to *avoid* needless expense, TP-Link spent 10.4 hours of definitive research, from what appears, preparatory to *incurring* needless expense. There was no emergency requiring extensive pre-motion research before "thorough" discussion of "contemplation," as specified in Local Rule 7-3. And, manifestly contrary to Local Rule 7-3, TP-Link did not use the fruits of 10.4 research hours to "thoroughly discuss" its contemplated stay motion in the disingenuous conference of January 9th.

Although TP-Link counsel references a "discussion" of a possible stay motion during a Rule 7-3 conference initially set solely for a discovery matter on January 9th, the "discussion" was nothing more than a brief mention, at most initiating a conversation. TP-Link also placed on agenda a Rule 11 Motion discussion in the Rule 7-3 conference, which motion was never warranted or filed. The matter of a discovery stay was not "thoroughly" discussed, and much of such a motion's "substance" was not revealed, contrary to Local Rule 7-3. We recall that the "discussion" was not left in anything resembling a final decisional mode. As demonstrated on January 21-22, 2020, undersigned would not refuse to cooperate in a stay given reasonable notice of intended motion practice and citation of relevant legal support, subject to due diligence as to the court's customary view of staying discovery proceedings.  TP-Link not infrequently suggests courses of conduct, conspicuously omitting to provide Careful Shopper with good cause to cooperate.

During the period of January 9-22, 2020 undersigned counsel was in almost daily email contact with TP-Link counsel. Almost all contact related to intensive discovery efforts which TP-Link never resisted on the basis of an impending stay motion.  As all know, Careful Shopper could cease discovery efforts only at considerable peril in Judge Staton's or Magistrate-Judge Scott's courtroom, unless and until discovery is actually stayed. Despite frequent interactions TP-Link counsel never mentioned the stay issue . . . not once. From the January 9 Local Rule 7-3

Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees

conference (after already expending 10.4 hours on the task), TP-Link had 10 days to follow up, if it was interested, on its suggestion of a stay, i.e. *before* spending an additional roughly 33 hours finally drafting the motion for stay.  Instead, TP-Link allowed the process to wind out, day after day. This is a "special circumstance" under *Ketchum, supra.*

### B.  Discussion of TP-Link's Fee Application

### 1.  Applicable Law

The starting point for determining an award of attorneys' fees under §425.16(c) is calculation of the "lodestar" amount, i.e., the product of the "number of hours reasonably expended multiplied by the reasonable hourly rate." *Ketchum,* 24 Cal.4th at 1134; see *id.* at 1135-36. *Mireskandari v. Daily Mail Gen. Tr. PLC,* 2014 U.S. Dist. LEXIS 201202, at *33-36 (C.D. Cal. 2014). Lodestar may be adjusted for the novelty and difficulty, skill displayed, preclusion of other employment, and contingency of payment, *inter alia.* The purpose of such adjustment is to fix a fee at the fair market value for the particular action. "It is the burden of the challenging party to point to the specific items challenged, with a sufficient argument and citations to the evidence." *Premier Medical Mgmt. Systems, Inc. v. Cal. Ins. Guarantee Ass'n*, 163 Cal. App. 4th 550, 564, 77 Cal. Rptr. 3d 695 (2008); *Sentinel Offender Servs., LLC v. G4S Secure Sols. United States, Inc.*, 2017 U.S. Dist. LEXIS 181958, at *21 (C.D. Cal. 2017).

2.  **Scope of Compensability**

An award of fees is broadly discretionary.  Recent cases set the scope of prevailing anti-SLAPP movant fees at the reasonable and necessary services incidental to the anti-SLAPP motion itself.  Noteworthy here, there was no hearing, oral argument or other necessary services beyond TP-Link's preparation of a non-novel, straightforward motion to strike and/or dismiss.   "The fees awarded should encompass all proceedings directly related to defendants' special motion to strike . . . ." *Mireskandari, supra* 2014 U.S. Dist. LEXIS 201202 at *2, 2014 WL 12586434, at *4 (C.D. Cal. 2014); *Grant & Eisenhofer, P.A. v. Brown*, 2018 U.S. Dist. LEXIS 227454, at *2-3 (C.D. Cal. 2018).

TP-Link cites (Mem. at 8) *Graham-Sult v. Clainos*, 756 F.3d 724 (9th Cir. Feb. 5, 2014) as illustrating "the broad scope of fees awarded under CCP § 425.16(c)(1)."  Undisclosed by TP-Link, upon "subsequent indication from the California courts that [the Ninth Circuit's] interpretation [in *Graham-Sult v. Clainos*] was incorrect," the Ninth Circuit reversed itself, to wit: "[i]n *Graham-Sult v. Clainos*, 756 F.3d 724, 752 (9th Cir. 2014), we affirmed a fee award under California's anti-SLAPP statute that included fees for time that the defendants' lawyers spent "not exclusively in pursuit of the anti-SLAPP motion," such as hours 'spent on the motion to dismiss.' But a more recent California case undermines *Graham-Sult* and guides us here."  *Century Sur. Co. v. Prince*, 782 F.

App'x 553, 558 (9th Cir. 2019).

Exemplative applications of the applicable scope of compensability include *Fitbit, supra,* which this court found analogous, where the court awarded $10,000, opining that 13 hours was an appropriate timeframe to prepare and present a relatively straightforward anti-SLAPP motion. 2018 U.S. Dist. LEXIS 2402, at *26. In *Sparling v. Bank of Am. Bus. Lending Servs.*, 2018 U.S. Dist. LEXIS 226087, at *8-9 (C.D. Cal. 2018) the court awarded $5,838.  Again, even where fee numbers are significantly greater than $10,000, petitioning counsel sought fees only for work directly related to the special motion to strike.

In *Kajeet, Inc. v. Qustodio, LLC*, 2019 U.S. Dist. LEXIS 228068 *12 (C.D. Cal. 2019) Judge Kronstadt adjudicated an application for 191.9 hours seeking $90,552.10. A small allowance was made for local counsel, but the court denied compensation for more than two (2) lawyers on the preparation of the special motion and reply to opposition. The award was $27,030. Noteworthy, no fees were sought for services exceeding in scope the preparation of and reply on the anti-SLAPP motion itself. In *Christie v. Lester*, 2015 U.S. Dist. LEXIS 189810 at *7 (C.D. Cal. 2015), Judge Klausner opined as to anti-SLAPP litigation, including a hearing, "previous cases have determined 50 hours to be reasonable for anti-SLAPP litigation. *Maughan*, 143 Cal. App. 4th at 1249."

TP-Link's request for compensation of $122,849.50 for substantially all hours

spent on the case from November 12, 2019 calls to mind the words of Judge

Margaret M. Marrow: "'[a] fee request that appears unreasonably inflated is a

special circumstance permitting the trial court to reduce the award or deny one

altogether.' *Ketchum*, 24 Cal.4th at 1137."  *Mireskandari, supra* at 2014 U.S. Dist.

LEXIS 201202, at *7.

### 3.  Critique of TP-Link Timesheet (ECF 92-1)

TP-Link seeks compensation at this time for its initial review of and research

the state law counterclaims on November 12, 2019 (1.8 HFA), 11/13 research of

those counterclaims (1.3), 11/13 "strategize vis-à-vis those counterclaims (1.5 HFA,

2.5 PC, 1.5 OHT), 11/14  confer re potential defenses (HFA .6).  None of this work

(heavily block billed) would seem compensable.  It is the anti-SLAPP motion –not

the case—that is compensable.   Contrary to *Kajeet, supra*, TP-Link seeks

compensation for three (3) attorneys on all major task areas, routinely duplicative

tasks, and with no indication in the timesheet of a need beyond two (2) attorneys on

any aspect of the anti-SLAPP motion.  Three attorneys per task was the routine.

Discovery is non-compensable as unrelated to the anti-SLAPP motion.[8]

Discovery is not compensable because it is not directly related to the anti-SLAPP

---

[8] For example, discovery hours were billed on 11/21,24 (.9), 25 (.4), 26 (.2), 12/1 (.2), 12/12 (4.0), 12/13 (3.9)(1.4), 12/15 (.7), 12/16 ( .3), 12/19 (3.5), 12/20 (1.0 + 1.7 [block billed]), 12/22 (1.1), 12/24 (1.8).  This cycle would repeat itself when discovery deadlines and responses to deficient discovery responses presented themselves.  E.g. from 1/13/20 to 1/20/20 TP-Link logged approximately 13.3 hours of discovery related matters for which it seeks compensation.

motion. E.g., *Mireskandari*, *Grant & Eisenhofer*, *Christie supra*.  TP-Link labels Careful Shopper's discovery efforts as "relentless" in an effort evoke undeserved sympathy and to be compensated therefore; but a high level of diligence, i.e. "relentlessness" per TP-Link, must be demonstrable under Judge Staton's Procedure No 17.  Careful Shopper sought to use every day so as not to be later criticized.

　　　　Duplicative and excessive hours are also presented for compensation. For example, PC and OHT spent four (4) hours on 11/13/19 strategizing to implement a SLAPP initiative; and then, on 11/14/19, HFA shows .6 hours for "potential defenses", OHT shows 4.0 for anti-SLAPP research, and PC shows 3.3 hours for anti-SLAPP research and another .6 for team strategizing . . .12.5 hours to begin the SLAPP initiative with overlapping research and strategy sessions amongst three (3) lawyers. On 12/15 OHT shows further anti-SLAPP research (2.5) in a block  billed entry that includes the CA litigation privilege, while on 11/17 additional SLAPP research of HFA is executed, i.e. the 3d lawyer performing the same task, for 2.1 hours.  This cycle repeats itself, with PC doing CA litigation privilege research of 2.1 hours on 11/18 with no indication as to why this same research per timesheet, done on 11/17, was inadequate.  But the basic CA litigation privilege research was not yet done: OHT on 11/21 (1.0), PC on 11/21 (2.0).  This pathology obtained as well in the drafting of the anti-SLAPP motion: OHT begins outlining the motion (5.0) on 11/22, continuing on 11/29 (5.0), and continued on 12/4 (2.5) and 12/5 (3.5)

and 12/6 (6.0) and 12/9 (2.9) and 12/10 (5.0 block billing).  At this point OHT was assigned to draft a letter requesting a Local Rule 7-3 conference: 12/12 (3.0), 12/13 (1.6), with PC's input on 12/18(2.4) and HFA on 12/19 (1.3), i.e three (3) lawyers on task.  As of 12/13 Mr. Tuffaha alone has some 40 hours, pre-drafting of anti-SLAPP motion, in research, analysis, and outlining of the anticipated motion. The two partners on the anti-SLAPP initiative have an additional 15 or so hours. *Drafting of the motion has yet to begin and Careful Shopper counsel was still navigating Local Rule 7-2 daily with no idea of what is to come.*

Drafting of the motion itself, following about 55 hours of workup, followed the same three-lawyer, excessive hours pattern seen above.[9] TP-Link seeks compensation for about 95 drafting hours ( including a few unbundled block billed hours) vis-à-vis the motion to strike (ECF 62).  By adding in the above specified 55 hours of pre-drafting, related endeavors, the total comes to some 145 hours, i.e. almost 3 times  the reasonable hours for an entire anti-SLAPP litigation, typically

---

[9] Drafting began on 12/16 OHT (3.5), 12/18 (2.0), 12/19 (6.3 block billed entry), PC (1.9 block billed)-HFA (1.2) conf. on 12/19, 12/20 HFA (.5) and HFA (1.7), 12/20 OHT (4.8), PC (1.7),  12/23 HFA (.8), (3.8), 12/23 OHT (.8), (4.7), 12/23 PC (2.2), (1.6), 12/24 (1.7), (2.1), 12/24 OHT (3.6), 12/25 HFA (3.8), 12/26 OHT (5.0), 12/27 (6.9), 12/28 HFA (.4), 12/29 (2.2) 12/31 PC (1.4),1/2 HFA (.2)(.5)(.2)(.4), 1/2 OHT (6.0), PC (.2)(2.8), 1/3 PC (1.9), 1/16 HFA (.9), 1/16 OHT (5.0), 1/17 (6.4 block billed with other items).

including all analysis, research, writing and evidence/argument upon hearing.[10]  We submit TP-Link seeks to "leverage the statute to obtain an 'unjust' award."

TP-Link's excessive fee request, i.e. several times Judge Klausner's rule of thumb, is a third "special circumstance," *Ketchum supra*, the first two special circumstances being the Motion to Stay Discovery and  position/representation on "litigation conduct."

## V.    TP-LINK'S ATTACK ON OPPOSING COUNSEL

Desperate to have this court overlook controlling precedent, TP-Link in note 1 of its application seeks to sully undersigned and plaintiff's managing member before the court by reporting on the public record that undersigned and Careful Shopper's principal have an improper, long-standing relationship as "partners."

In truth, the relationship which TP-Link thoughtlessly devalues serves the public interest by enforcing decency in consumer commerce. Mr. Starke has served as a representative plaintiff in several class actions and has "made the world a better place" in almost all of them. Nor is the role of public interest lawyer new to undersigned, who filed the first consumer class action of note in the Northern District of Ohio in 1971, resulting in a revolution in periodic statement disclosure, affecting billions of Mastercard and Visa periodic billing statements, made possible

---

[10] We have approximated the hours for which TP-Link seeks compensation vis-à-vis its Reply Brief, ECF 78, for services performed thereon from February 11, 2020 through February 21, 2020. Approximately 39.6 hours.

by the then-new Truth in Lending Act.  Before resuming the consumer class action practice about 10 years ago, counsel studied—and continues to study—existing perceptions of such a practice. Undersigned agrees with Judge Easterbrook:

> Murray tells us that she has filed 'only' nine suits; her husband and four children filed the rest. Still, the Murrays are in this big time. What the district judge did not explain, though, is why 'professional' is a dirty word. It implies experience, if not expertise. The district judge did not cite a single decision supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders.

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006).

SquareTrade, Inc., a subsidiary of Allstate Insurance, was the first desperate defendant to attempt to poison a court with substantially the information now advanced by TP-Link (see ECF 92-2, Page ID 1633), in *Starke v. SquareTrade, Inc.* No. 1:16-cv-07036- NGG (E.D.N.Y), on appeal to the Second Circuit, 913 F.3d 279 (2d Cir. 2019).[11]  The Second Circuit ignored the crude and cynical tactic employed there . . . and now here . . . and handed Mr. Starke a landmark decision addressing

---

[11] See ECF 44 at p.25n.4, Case No.17-2474 (2d Cir. filed 10/30/17)   In *SquareTrade,* however, the tactic was arguably justified to show that Starke was a sophisticated consumer who could decipher SquareTrade's labyrinthian maze of misleading disclosure.  Here there is no excuse.

Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees

the unfairness of inconspicuous disclosures binding consumers to arbitration

agreements. The decision has been followed in the Ninth Circuit. See *Wilson v.*

*Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019). Mr. Starke and undersigned's

collaboration has contributed important developments in the law as attorney-

client… not as partners.

But TP-Link goes farther than merely insulting counsel and attempting to

unfairly influence the court's thinking with suggestive statements, to wit: TP-Link

alleges that undersigned "has also **partnered** with Careful Shopper's owner, Adam

Starke."  In so stating, TP-Link counsel has gone too far.  On April 5, 2020 (as well

as previously) we advised TP-Link counsel (see Exhibit 5 hereto) against just this

type of behavior: "The local rules [***L.R. 83-3.1.2***] require you and your firm to abide

by . . . Model Rules of Professional Conduct . . . may be considered as guidance: "

The Model Rules prohibit a lawyer from engaging in undignified or

discourteous conduct. Such conduct is sanctionable if it is completely without

merit and undertaken primarily to harass or maliciously injure another.

Then came footnote 1 to TP-Link's instant memorandum, having absolutely nothing

to do with this case, obliquely suggesting improper financial arrangements between

undersigned and Mr. Starke, and all for the purpose of sullying undersigned's

credibility and inflaming the court.  Court's do not permit such conduct:

we decide that Munson could be sanctioned under the district court's inherent

power . . .  Under the circumstances here, Munson's conduct 'crossed the line from passionate advocacy . . . into sanctionable conduct evincing bad faith.' *60E. 80th St. Equities, Inc. v. Sapir* (*In re 60 E. 80th St.* [*1329] Equities, Inc.), 218 F.3d 109, 117 (2d Cir. 2000)

*Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1328-29 (11th Cir. 2002). TP-Link's conduct offends ABA Model Rules 3.1 (assertion of frivolous claims); 4.4 (conduct with no substantial purpose other than to embarrass, delay or burden a third person); 8.4(d) (conduct prejudicial to administration of justice).  This is not only a fourth "special circumstance" warranting denial of attorney fees to applicant-TP-Link but, moreover, it is a slight to the honored profession's integrity . . . all for a fee. (Where was TP-Link's concern for propriety when undersigned sought *pro hac vice* admission?)

## CONCLUSION

If, despite what we view as grounds warranting a vacation of ECF 82, decretal paragraphs 1 and 2 (see ECF 88), and despite the four (4) special circumstances we have highlighted above, the court determines in its discretion to award TP-Link attorney fees, we submit that TP-Link should be awarded 40 hours at a blended rate of the sum of the three lawyers' hourly rates divided by 3:

$475+$475+$275/3=$408.33 per hour @ 40 hours=**$16,333.20**

*Kajeet, Inc. v. Qustodio, LLC*, 2019 U.S. Dist. LEXIS 228068 *12 (C.D. Cal. 2019).

1

2

3

4                               Respectfully submitted,

5

6                               /s/ Mark Schlachet

7                               Mark Schlachet (OSB 0009881) [Admitted
                                PHV]

8                               markschlachet@me.com

9                               3515 Severn Road
                                Cleveland, Ohio 44118

10                              Tel: (216)225-7559

11                              Fax: (216)932-5390

12                              Christopher J. Hammond (SBN 150024)

13                              chammond@bizlawpro.com
                                21540 Prairie Street, Unit A

14                              Chatsworth, CA 91311

15                              Tel: (866)625-2529
                                Fax: (866)463-9285

16

17                              *Attorneys for Defendants Careful Shopper,
                                LLC, Adam Starke and Sora Starke*

18

19

20

21

22

23

24

25

26

27

28

**EXHIBITS TO CAREFUL SHOPPER'S BRIEF IN OPPOSITION TO TP-LINK'S NOTICE OF MOTION AND MOTION TO FIX ATTORNEYS FEES AND COSTS IN CONNECTION WITH MOTION TO STRIKE (ECF 92**

Exhibit 1: Deposition of William Fikhman in *Solu-Med, Inc. v. Youngblood Skin Care Products, Inc.,* Case No. 19-cv-60487 (S.D. FL) (relevant potions) ..................................................................... X-2

Exhibit 2: Verbiage that may have been used when Amazzia submitted a complaint to Amazon................................................................... X-8

Exhibit 3: Declaration of William Fikhman filed March 30, 2020 in *Thimes Solutions, Inc. v. TP-Link USA Corporation, et al,* Case 2:19-cv-10374-PA-E, ECF 101-23 ......................................................................... X-10

Exhibit 4: Counsel's real time file log for research session January 22, 2020

............................................................................................... X-16

Exhibit 5: Email segment of April 5, 2020, Mark Schlachet to Heather F. Auyang, Esq., addressing ethical concerns............................................. X-18

# EXHIBIT 1

**EXHIBIT 1**: Deposition of William Fikhman in *Solu-Med, Inc. v. Youngblood Skin Care Products, Inc.,* Case No. 19-cv-60487 (S.D. FL) (relevant potions)

PMK WILLIAM FIKHMAN  30(b)(6), Confidential                               December 10, 2019
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE                                            1—4

---

**Page 1**

```
 1           UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF FLORIDA
 3
 4    SOLU-MED, INC.,                  )
                                       )
 5              Plaintiff,     )Case No.
                               )0:10-cv-60487
 6         vs.                 )
                               )
 7    YOUNGBLOOD SKIN CARE PRODUCTS  )
      LLC,                            )
 8                                    )
              Defendants.      )
 9    _____)
10
11           * * * CONFIDENTIAL * * *
12
13      VIDEOTAPED 30(b)(6) DEPOSITION OF
14      THIRD-PARTY, AMAZZIA, BY AND THROUGH
15           PERSON MOST KNOWLEDGEABLE
16              WILLIAM FIKHMAN
17
18              DECEMBER 10, 2019
19                 10:18 A.M.
20
21           16501 Ventura Boulevard
22              Encino, California
23
24
25         Susan Pobor, CSR No. 5132
```

---

**Page 2**

```
 1           APPEARANCES OF COUNSEL
 2
 3    ON BEHALF OF PLAINTIFF, SOLU-MED, INC.:
 4         GOODMAN & SAPERSTEIN
           BY:  STANLEY R. GOODMAN, ESQ.
 5         666 OLD COUNTRY ROAD
           SUITE 200
 6         GARDEN CITY, NEW YORK  11530
           (516) 227-2100
 7         GSESQ@AOL.COM
 8              -- AND --
 9         BLACK LAW, P.A.
           BY:  KELSEY K. BLACK, EQ.
10              (Via telephone)
           1401 East Broward Boulevard
11         Suite 204
           Fort Lauderdale, Florida  33301
12         (954) 320-6220
           Kelsey@kkbpa.com
13
14    ON BEHALF OF DEFENDANT, YOUNGBLOOD SKIN CARE
      PRODUCTS LLC:
15
           COLE, SCOTT & KISSANE, P.A.
16         BY:  JONATHAN VINE, ESQ.
           222 Lakeview Avenue
17         Suite 120
           West Palm Beach, Florida  33401
18         (561) 383-9200
           Jonathan.Vine@csklegal.com
19
20    ON BEHALF OF THIRD-PARTY, Amazzia:
21         BURKHALTER KESSLER CLEMENT & GEORGE LLP
           BY:  ANDREW M. CUMMINGS, ESQ.
22         2020 Main Street
           Suite 600
23         Irvine, California  92614
           (949) 975-7500
24         Acummings@bkcglaw.com
25
```

---

**Page 3**

```
 1           APPEARANCES (CONTINUED):
 2
 3    VIDEOGRAPHER:  DANIEL ROCCO
 4
      ALSO PRESENT:  JASON TOTH
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1                I N D E X
 2
 3    WITNESS          EXAMINATION       PAGE
 4    WILLIAM FIKHMAN   BY MR. VINE        7
 5                      BY MR. GOODMAN    108
 6                      BY MR. VINE       164
 7
 8            E X H I B I T S
 9
10    EXHIBITS          DESCRIPTION       PAGE
11    Exhibit 1   Notice of Deposition,    10
                  attaching a document
12                entitled "Scheduled 'A'
                  Areas of Inquiry
13
      Exhibit 2   Document entitled,       26
14                "Youngblood Skin Care
                  Products, LLC
15                Distributor Agreement
16    Exhibit 3   Amazon Management Agreement   29
                  between Youngblood and
17                Amazzia
18    Exhibit 4   Condition Guidelines from    42
                  Amazon
19
      Exhibit 5   Document entitled,       45
20                "Cosmetics & Skin/Hair
                  Care"
21
      Exhibit 6   Document entitled, Amazon    50
22                Product Authenticity and
                  Quality
23
      Exhibit 7   Document entitled, "Amazon    68
24                Anti-Counterfeiting Policy"
25
```

---



ESQUIRE
DEPOSITION SOLUTIONS            EXHIBIT 3                   800.211.DEPO (3376)
                                                           EsquireSolutions.com

**Exhibit 1 to Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees¸ p. 1**

PMK WILLIAM FIKHMAN  30(b)(6), Confidential                          December 10, 2019
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE                                        9–12

Page 9

1    Q.  Okay.
2        And, lastly, any time you need a break,
3    feel free to let your counsel know, and we can take
4    a break.
5        Okay?
6    A.  Okay.
7    Q.  Okay.  Great.
8        Can you give me your current address?
9    A.  Business or --
10   Q.  Business is fine.
11   A.  7040 Darby Avenue, Reseda, California,
12   91335.
13   Q.  Where -- Where are you employed?
14   A.  Auction Brothers, Inc. doing business as
15   Amazzia.
16   Q.  Okay.
17       And are you one of the owners of the
18   company?
19   A.  I am.
20   Q.  Okay.
21       How many owners are there at the company?
22   A.  Three.
23   Q.  And who are the owners?
24   A.  Mike Fikhman, George Fikhman and
25   William Fikhman.

Page 10

1        (Whereupon Exhibit 1 was marked
2        for identification)
3    BY MR. VINE:
4    Q.  Okay.  We've marked as Exhibit 1 -- it's a
5    Notice of Deposition with an Exhibit A with areas
6    that we seek to depose you on.
7        Can you take a look at it and tell me if
8    you've seen this before?
9    A.  Yes.
10   Q.  Okay.  If you could stay on the third page.
11       The third page is an exhibit that lists
12   areas of a potential inquiry.
13       Correct?
14   A.  Yes.
15   Q.  Okay.
16       Do you -- Are you the designee from Amazzia
17   to answer questions regarding those listed on -- in
18   Exhibit 1?
19   A.  Yes.
20   Q.  Okay.
21       Can you just give me a brief description of
22   your educational background?
23   A.  I have a bachelors in accounting and
24   business honors --
25   Q.  Okay.

Page 11

1    A.  -- from Cal State Northridge.  Cal State
2    Northridge.
3    Q.  Okay.
4        And how long have you been working at
5    Amazzia?
6    A.  The corporation is 15 years old.  So the
7    entire 15 years.
8    Q.  Okay.
9    A.  It has not always been Amazzia.
10   Q.  Okay.
11       So why -- why don't we start --
12       How -- When was -- When did Amazzia become
13   first incorporated or began?
14   A.  Amazzia became a dba of Auction Brothers
15   maybe two years ago.
16   Q.  Okay.
17       Prior to that, it was some -- it was
18   Auction Brothers?
19   A.  It was just Auction Brothers.
20   Q.  What -- What was the nature of the business
21   for Auction Brothers?
22   A.  It was Amazon reselling.
23   Q.  Amazon.
24       And -- And why --
25       About two years ago, you said, 2017?

Page 12

1    Is that correct?
2    A.  (No audible response).
3    Q.  You have to respond verbally.
4    A.  Yes.
5    Q.  Okay.
6        About two years ago?
7    A.  Yes.
8    Q.  Okay.
9        And why did it change its name to "Amazzia"
10   or use a dba?
11   A.  We created -- We pivoted the business
12   model towards more of the Amazon brand protection
13   and management model.
14       Prior to that, it was just purely
15   reselling products on Amazon without any exclusive
16   relationships with brands.
17   Q.  Okay.
18       When did you begin --
19       Strike that.
20       Would you agree with me that you handled
21   brand protection prior to converting into the name
22   of "Amazzia"?
23   A.  Yes.
24   Q.  Okay.
25       When did Auction Brothers or the



800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit 1 to Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees¸ p. 2**

PMK WILLIAM FIKHMAN  30(b)(6), Confidential                    December 10, 2019
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE                        53–56

Page 53

1   allowed by another policy, because you can't sell
2   cosmetic products as used.
3   BY MR. VINE:
4       Q.  So all --
5           And that's a great segue.
6           All these policies that Amazon has, they
7   all kind of work hand-in-hand together.
8           Correct?
9       A.  Yes.
10      Q.  And when you provide your brand protection
11  services, do you rely on these guidelines when you
12  provide advice to your clients?
13      A.  Absolutely.
14          Everything we do is based on these
15  guidelines that Amazon sets forward.
16      Q.  And you take your job very seriously.
17          Correct?
18      A.  Yes.
19      Q.  And you provide the protection to your
20  clients in a diligent way.
21          Correct?
22          MR. GOODMAN:  Objection.
23          THE WITNESS:  Correct.
24  BY MR. VINE:
25      Q.  Okay.

Page 54

1           I mean, you don't just report people for
2   the fun of reporting people to --
3       A.  Absolutely not.
4           All of our reporting processes are
5   actually very methodical and organized and
6   strategic.
7       Q.  Okay.
8           So can you talk about how they're
9   methodical and strategic for -- for the ladies and
10  gentlemen of the jury?
11      A.  Sure.
12          So -- We -- We have a directive from the
13  brand of, in this case, removing any sellers that
14  are not authorized.
15          We have a team that works daily, 24/7/365.
16          Half of our team is here in L.A., and half
17  of out team is overseas in the Philippines.  So we
18  literally have 24 coverage -- 24/7 monitoring and
19  coverage of the listings.
20          And so we are looking at pages at all
21  times of the day and taking snapshots and seeing if
22  somebody is selling and breaking these rules.  Then
23  we're moving forward to proving that to Amazon, and
24  removing them from the marketplace.
25          And if they --

Page 55

1           That's it.
2       Q.  Okay.
3           So if you look back at Exhibit 6, which is
4   the Amazon guidelines regarding product
5   authenticity and quality --
6           Why don't you read out loud for the ladies
7   and gentlemen of the jury the first sentence,
8   what's important for Amazon.
9       A.  "Customers trust that they can always buy
10  with confidence on Amazon.  As a seller it's
11  important to understand Amazon's guidelines on
12  product quality and authenticity".
13      Q.  Okay.
14          So it's important based --
15          Would you agree with me that it was
16  important for sellers such as Solu-Med to comply
17  with the Amazon product authenticity and quality
18  guidelines?
19      A.  Yes.
20      Q.  Okay.
21          And, in fact, Amazon requires that.
22          Correct?
23      A.  Yes.
24      Q.  Does this guideline indicate whether Amazon
25  enforces sellers who violate their policies?

Page 56

1       A.  It does say --
2           In the "Enforcement" section at the
3   bottom, it does say that if you violate these
4   policies, Amazon may:  Cancel your listings; limit,
5   suspend, or block your ability to sell [sic]
6   products; or suspend or block your entire [sic]
7   ability to sell on Amazon, which is what happened
8   in Solu-Med's case here.
9       Q.  Okay.
10          So if a company such as Solu-Med violated
11  Amazon's policies, Amazon reserved the right to do
12  any of those three things?
13      A.  Correct.
14      Q.  Okay.
15          And, in fact, it also indicates on the next
16  page, two other additional items.
17          Is that correct?
18      A.  Yes.
19          It can remove or dispose of your FBA
20  inventory, or withhold your payments.
21      Q.  What's FBA inventory?
22      A.  "FBA" stands for fulfilled by Amazon, and
23  it means that a seller such as Solu-Med would ship
24  their inventory into Amazon's fulfillment centers,
25  and Amazon holds the inventory in their custody and

**Exhibit 1 to Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees¸ p. 3**

PMK WILLIAM FIKHMAN  30(b)(6), Confidential
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE

December 10, 2019
85–88

Page 85

1    You're all set?
2    A.  Yes.  I just didn't want confusion around
3    is Solu-Med a seller.
4        We had it as Life and Health Source, and
5    that's --
6    Q.  Is Life and Health Source a seller?
7    A.  Yes.
8    Q.  And, obviously, the owner of Life and
9    Health Source, that would go -- the Seller Policy
10   and Code of Conduct would apply.
11       Correct?
12   A.  Yes.
13   Q.  Okay.
14       So the seller would be required to comply
15   with the Code of Conduct issued by Amazon?
16   A.  Absolutely.
17   Q.  And one of the items that Amazon has in the
18   first bullet point talks about providing accurate
19   information to its customers?
20   A.  Yes.
21   Q.  Would selling a product as new without a
22   warranty and a guarantee be inaccurate
23   information --
24   A.  No.
25   Q.  -- to its customers?

Page 86

1    A.  That would be a -- That would be
2    inaccurate.
3    Q.  Okay.
4        (Whereupon Exhibit 9 was marked
5        for identification)
6    BY MR. VINE:
7    Q.  Marked as Exhibit 9 is a complaint that was
8    submitted to Amazon on behalf of Youngblood.
9        After you've had an opportunity to review
10   this, let me know when you're done.
11   A.  I'm done.
12   Q.  Okay.
13       This is a complaint --
14       What is this?
15       Sorry.
16   A.  This looks like verbiage that may have
17   been used when we submit a complaint to Amazon.
18   Q.  All right.
19       I understand when you submit it, it's on a
20   website platform?
21   A.  Correct.
22   Q.  Okay.
23       And you input information within specific
24   categories?
25   A.  Correct.  We would insert this message

Page 87

1    into the box --
2    Q.  Okay.
3    A.  -- on a -- on the platform.
4    Q.  So it says:  "We have researched
5    Youngblood's listings and found the following ASINs
6    are in violation of our trademark..."
7        Do you see that?
8    A.  Yes.
9    Q.  Okay.
10       And that's Youngblood's trademark?
11   A.  I don't know for sure, but I'm assuming.
12   Q.  Okay.
13       This is an item that was drafted by
14   Amazzia.
15       Correct?
16   A.  I don't know for sure.
17       I'm -- I'm not deny -- disputing that, but
18   I -- I would need a -- if we want to know if that
19   trademarks --
20   Q.  I'm not asking that.
21   A.  Okay.
22   Q.  I changed --
23       Youngblood hired Amazzia for brand
24   protection.
25       Correct?

Page 88

1    A.  Yes.
2    Q.  Amazzia is the one who filed the complaint
3    about Solu-Med or Life and Health Source to Amazon.
4        Correct?
5    A.  Yes.
6    Q.  Okay.
7        And so if this is the complaint that Amazon
8    relied on, this would be the document that was
9    drafted by Amazzia.
10       Correct?
11   A.  Yes.
12   Q.  Okay.
13       And if you look, it talks about
14   authenticity.
15       Do you see that?
16   A.  Yes.
17   Q.  And the request was to remove the sellers
18   from selling just this product.
19       Correct?
20   A.  Correct.
21   Q.  Okay.
22       You weren't asking that the seller's store
23   be shut down.
24       Correct?
25   A.  Correct.



**Exhibit 1 to Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees¸ p. 4**

PMK WILLIAM FIKHMAN  30(b)(6), Confidential                    December 10, 2019
SOLU-MED, INC., vs YOUNGBLOOD SKIN CARE                              169–170

```
                                                              Page 169
 1                      DEPOSITION ERRATA SHEET

 2

 3   Page No.____Line No._____Change to: _____

 4   _____

 5   Reason for change: _____

 6   Page No.____Line No._____Change to: _____

 7   _____

 8   Reason for change: _____

 9   Page No.____Line No._____Change to: _____

10   _____

11   Reason for change: _____

12   Page No.____Line No._____Change to: _____

13   _____

14   Reason for change: _____

15   Page No.____Line No._____Change to: _____

16   _____

17   Reason for change: _____

18   Page No.____Line No._____Change to: _____

19   _____

20   Reason for change: _____

21   Page No.____Line No._____Change to: _____

22   _____

23   Reason for change: _____

24   SIGNATURE:_____DATE:_____

25        [WILLIAM FIKHMAN] [JOB NO. J4663289]
```

```
                                                              Page 170
 1   STATE OF CALIFORNIA   )
                           )   ss.
 2   COUNTY OF LOS ANGELES )

 3        I, SUSAN POBOR, Certified Shorthand Reporter

 4   No. 5132 for the State of California, do hereby

 5   certify:

 6        That prior to being examined, the witness named

 7   in the foregoing deposition, was duly sworn to

 8   testify the truth, the whole truth, and nothing but

 9   the truth;

10        That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced by me to typewritten form and

13   that the same is a true, correct, and complete

14   transcript of said proceedings.

15        Before completion of the deposition, review of

16   the transcript [ ] was [ ] was not requested.  If

17   requested, any changes made by the deponent (and

18   provided to the reporter) during the period allowed

19   are appended hereto.

20        I further certify that I am not interested in

21   the outcome of the action.

22        Witness my hand this 15th day of December,

23   2019.

24

25        Susan Pobor, CSR No. 5132
```

**ESQUIRE**
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit 1 to Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees, p. 5**

# EXHIBIT 2

**EXHIBIT 2**: Verbiage that may have been used when Amazzia submitted a complaint to Amazon



**Name and Contact Info of entity that submitted take down notice**:

Complaint ID 5518323151 submitted by RO contact: brandprotection@ybskin.com; Brand Name Youngblood.

"Hello,

We have researched Youngblood's listings and found the following ASINs are in violation of our trademark, 3812755.

- Counterfeit products are being sold on the following listings

- Please immediate action and remove these sellers currently listing counterfeit product.

According to Amazon's robust and aggressive anti-counterfeit policy, sellers must list items that match the detail pages exactly. The indicated sellers are not selling the authentic products as shown in the ASIN(s) referenced.

We know that Amazon takes product authenticity very seriously and Amazon requires sellers to list items that exactly match the detail pages. Therefore, we respectfully request that Amazon immediately and proactively remove these sellers from the mentioned ASIN(s) and prohibit these sellers from listing against these ASIN(s) in the future.

Thank You,

Youngblood

PITS EXHIBIT 5 FOR ID
WENDY J. WRIGHT, CSR
DATE 12-9-19
WITNESS Toth
PAGE 1 OF 1

CONFIDENTIAL AMZN_00003

X-9

# EXHIBIT 3

**<u>EXHIBIT 3</u>**: Declaration of William Fikhman filed March 30, 2020 in *Thimes Solutions, Inc. v. TP-Link USA Corporation, et al*, Case 2:19-cv-10374-PA-E, ECF 101-23



1   BURKHALTER KESSLER CLEMENT & GEORGE LLP
    Alton G. Burkhalter, Esq., SBN 119594
2   E-mail: aburkhalter@bkcglaw.com
    Joshua A. Waldman, Esq., SBN 222859
3   E-mail: jwaldman@bkcglaw.com
    2020 Main Street, Suite 600
4   Irvine, California 92614
    Telephone: (949) 975-7500
5   Facsimile: (949) 975-7501

6   Attorneys for Defendant Auction Brothers, Inc. dba Amazzia

7

8                    UNITED STATES DISTRICT COURT

9           CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10  THIMES SOLUTIONS INC.              CASE NO. 2:19-cv-10374-PA-Ex

11              Plaintiff,             Assigned For All Purposes To:
                                       Honorable Percy Anderson
12      vs.                            Courtroom: 9A

13  TP-LINK USA CORPORATION,
    MIKHAIL FIKHMAN DBA AMAZZIA,
14  PREVAGEN, INC.

15              Defendants.            **DECLARATION OF WILLIAM
                                       FIKHMAN IN SUPPORT OF
16      And                            DEFENDANT AUCTION
                                       BROTHERS, INC. dba AMAZZIA'S
17                                     MOTION FOR SUMMARY
    AUCTION BROTHERS, INC. DBA         JUDGMENT**
18  AMAZZIA
    c/o MIKHAIL J. FINKHAM,            Fed. R. Civ. P. 56
19  Registered Agent
    19528 Ventura Blvd.                Hearing Date:      TBD
20  Tarzana, CA 91356-2917            Courtroom:          9A

21                                     Second Amended Complaint Filed:
                                       January 13, 2020
22

23

24

25

26

27

28

                    DECLARATION OF WILLIAM FIKHMAN

**Exhibit 3 to Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees¸ p. 1**

**DECLARATION OF WILLIAM FIKHMAN**

I, William Fikhman, declare as follows:

1.      I am the Chief Strategy Officer for Defendant Auction Brothers, Inc. dba Amazzia.  I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, I could and would testify competently thereto.

2.      I have been employed by Auction Brothers, Inc. for approximately the past fifteen years, and I have worked in my current role as Chief Strategy Officer for approximately the past year.  My duties and responsibilities as Chief Strategy Officer generally include oversight of sales, management and Amazon strategy.  Prior to working in the role of Chief Strategy Officer, I worked as Vice President for approximately 14 years.  My duties and responsibilities as Vice President were generally the same as my duties and responsibilities as Chief Strategy Officer.

3.      Auction Brothers, Inc. dba Amazzia ("Amazzia") has been in the business of providing brand protection services for approximately four years.  Amazzia's brand protection process generally consists of searching for its clients' products for sale on Amazon.com ("Amazon") in order to identify sellers who are not specifically authorized under a distribution agreement to purchase products directly from Amazzia's client(s) and thereafter sell such products (hereafter an "Unauthorized Reseller").  Once Amazzia identifies an Unauthorized Reseller that Amazzia knows is selling products to consumers that lack the same bundle of rights that a consumer would receive from an authorized seller, Amazzia generally notifies Amazon of the counterfeit products in the manner set forth below.

4.      One of Amazzia's clients was TP-Link USA Corporation ("TP-Link").  Amazzia has only provided brand protection services for TP-Link, and at no time has Amazzia (including any other dba or "alter ego" of Auction Brothers, Inc.) ever distributed TP-Link's products, nor does Amazzia have any intent to do so, nor

2
**DECLARATION OF WILLIAM FIKHMAN**

**Exhibit 3 to Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees¸ p. 2**

1    does Amazzia (including any other dba or "alter ego") currently have any plans to
2    distribute any networking products.  As part of its brand protection services, Amazzia
3    discovered that a company identified on Amazon's website only as "Universal Goods
4    and Sales" was selling TP-Link's 360 TP-Link AC5400 Routers (the "Routers")
5    through Amazon. Universal Goods and Sales represented that the Routers it offered for
6    sale on Amazon were "New" products, despite the fact that Amazzia understood that
7    Universal Goods and Sales was not an authorized reseller of TP-Link's Router, and as
8    such, Amazzia understood that Universal Goods and Sales could not provide to
9    purchasers of the Routers the same bundle of rights (such as warranty and service) that
10   an authorized reseller could.  In its Amazon posting, Universal Goods and Sales did
11   not indicate that it was not an authorized distributor of TP-Link products.

12          5.     Until Thimes Solutions, Inc. initiated this litigation, Amazzia only
13   knew of this seller on Amazon as "Universal Goods and Sales" because that was the
14   name that this seller used to identify itself on Amazon.   Amazzia was unaware of the
15   true corporate name and location of Universal Goods and Sales until Amazzia came to
16   learn through this litigation that Universal Goods and Sales is apparently a dba of
17   Thimes Solutions, Inc.

18          6.     For several years, Amazon has maintained a "Report Infringement"
19   online form that enables Amazon sellers or their agents to report complaints to
20   Amazon regarding sellers who are violating intellectual property rights.  The form
21   allows the complaining party to first identify whether the complaint relates to
22   copyright concerns, patent concerns or trademark concerns.  If a complaining party
23   identifies trademark concerns, then the form provides the complaining party with three
24   options to choose from, which are: (1) "a product detail page is unlawfully using my
25   trademark (e.g., in product title, product images, product description), (2) a product or
26   packaging has my trademark in it, or (3) a product is counterfeit (the product or
27   packaging has an unlawful reproduction of a registered trademark."   A complaining
28

3<br>

**DECLARATION OF WILLIAM FIKHMAN**

**Exhibit 3 to Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees¸ p. 3**

1    party must choose from one of the three options, as Amazon does not provide any
2    alternative options.  In addition to identifying one of the three available options, the
3    form further allows the complaining party limited space to enter   additional
4    information regarding the more specific basis for the complaint.  Amazon generally
5    sends Amazzia an email through Amazon's internal e-mail communication system
6    with sellers, confirming that a complaint had been received, but Amazon does not send
7    a copy of the submission itself and Amazzia does not otherwise maintain any record of
8    specific complaints made on Amazon's online system.

9            7.     Based on the limited information available to Amazzia from
10   Amazon's online complaint system, and consistent with Amazzia's regular practice,
11   Amazzia does not have, nor has it ever had, copies of the specific complaints it made
12   to Amazon regarding Universal Goods and Sales.  Moreover, as described above,
13   Amazon did not provide Amazzia copies of the complaints.

14           8.     Although Amazzia does not have a copy of the complaint made to
15   Amazon regarding Universal Goods and Sales, based on its general business pattern
16   and practice in connection with brand protection services for reporting counterfeit sales
17   to Amazon, Amazzia would have used the Amazon Report Infringement Form to
18   inform Amazon that Universal Goods and Sales was selling "counterfeit" Routers by
19   choosing the option (3) referenced above (i.e., "a product is counterfeit (the product or
20   packaging has an unlawful reproduction of a registered trademark.") and Amazzia
21   would also have provided additional comments to Amazon to the effect that: "The
22   seller indicated herein is selling products that do not include the same bundle of rights
23   that authentic products include.  Desired Action: Immediate removal of the seller's
24   offer of this counterfeit product."

25           9.     Amazzia selects the "counterfeit" option on Amazon's Report
26   Infringement Form as its standard business practice because Amazzia understands that
27   Amazon's "Condition Guidelines" specify that a product described as "New" must,
28

----

4

**DECLARATION OF WILLIAM FIKHMAN**

**Exhibit 3 to Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees¸ p. 4**

1   among other things, provide that the "Original manufacturer's warranty, if any, still
2   applies, with warranty details included in the listing comments." Because Amazzia
3   understands that the products that an Unauthorized Reseller like Universal Goods and
4   Sales sells lacks the original manufacturer's warranty, Amazzia deems those products
5   as counterfeit per Amazon's policies. Attached hereto as Exhibit "A" is a true and
6   correct copy of Amazon's Condition Guidelines that I understand were in effect during
7   the relevant time.

8        10.    Amazzia has no reason to believe that its communications with
9   Amazon regarding Universal Goods and Sales' sale of the unauthorized Routers were
10  inconsistent with its above described standard business pattern and practice.

11       11.    Once Amazzia submits a complaint to Amazon through its Report
12  Infringement online form that a seller of goods on Amazon is an Unauthorized Reseller
13  as described above, Amazzia has no further role in Amazon's determination regarding
14  how it will respond to the complaint (if it responds at all) and whether Amazon
15  ultimately elects to remove the Unauthorized Reseller's product from Amazon's site.
16  Consistent with the above, Amazzia had no further role in any decisions Amazon may
17  have made regarding Universal Goods and Sales' ability to sell Routers on Amazon
18  after Amazzia notified Amazon that Universal Goods and Sales sold counterfeits goods
19  as described above.

20
21       I declare, under penalty of perjury of the laws of the United States and the
22  State of California, that the foregoing is true and correct. Executed on March 27,
23  2020 at Reseda, California.

24
25                                          WILLIAM FIKHMAN
26
27
28

5

DECLARATION OF WILLIAM FIKHMAN

**Exhibit 3 to Brief in Opposition to Plaintiff's Motion to Fix Attorney Fees¸ p. 5**

# EXHIBIT 4

**EXHIBIT 4**: Counsel's real time file log for research session January 22, 2020

| ▼ | 📁 | Stay of Discovery | Jan 22, 2020 at 10:12 AM |
|---|---|---|---|
| | 📄 | BAC Home Loan Servicing_ LP v. Advanced Funding Strateg | Jan 22, 2020 at 9:54 AM |
| | 📄 | Mireskandari v. Daily Mail_ 2013 U.S. Dist. LEXIS 199145 | Jan 22, 2020 at 10:12 AM |
| | 📄 | Skellerup Indus. v. City of Los Angeles_ 163 F.R.D. 598 | Jan 22, 2020 at 9:58 AM |
| | 📄 | Vista Del Sol Health Care Servs. v. NLRB_ 2014 U.S. Dis | Jan 22, 2020 at 10:07 AM |

X-17

# EXHIBIT 5

**<u>EXHIBIT 5</u>**: Email segment of April 5, 2020, Mark Schlachet to Heather F. Auyang, Esq., addressing ethical concerns

Finally, today's publication to numerous counsel of purported ethical lapses on my part is not the first instance of your insulting remarks. The local rules require you and your firm to abide by "the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto. These statutes, rules and decisions are hereby adopted as the standards of professional conduct, and any breach or violation thereof may be the basis for the imposition of discipline. The Model Rules of Professional Conduct of the American Bar Association may be considered as guidance."

The Model Rules prohibit a lawyer from engaging in undignified or discourteous conduct. Such conduct is sanctionable if it is completely without merit and undertaken primarily to harass or maliciously injure another. I believe the Model Rules provide that a lawyer's conduct is frivolous if the conduct serves merely to harass or maliciously injure another. You directly and Prashanth less directly have on numerous occasions accosted and bullied me and others. In your case both instances followed immediately upon your being confronted with questionable conduct: (1) before Magistrate-Judge Levy for arguing issues you had taken off the table in a discovery hearing, and (2) now, telling Judge Staton that "[a]t-issue pre-suit communications with Amazon were unquestionably in furtherance of TP-Link's litigation conduct." As you know, Under Rule 3.1(a)(2) of the California Rules of Professional Conduct a lawyer is prohibited from "present[ing] a claim or defense in litigation that is not warranted under existing law." The pivotal issue of a communication's protected status vis-a-vis a good faith contemplation of litigation had no support in TP-Link/Amazzia's brief aside from TP-Link/Amazzia's representation that the "at-issue pre-suit communications with Amazon were unquestionably in furtherance of TP-Link's litigation conduct." With the knowledge we now have of Amazzia's "methodical" language, it is more probably than not that the the at-issue communications did not meet the requirements of *Neville and Sparrow, supra,* which TP-Link/Amazzia cited as applicable authority. ECF 62 at p.9. It appears that the anti-SLAPP defense, and particularly the quoted representation, was not warranted by existing law.

I asked TP-Link for nothing, zip, zota in exchange for a dismissal of the antitrust counterclaim. Hence, I can't imagine what prompted you to suggest that I am devising some sort of bargain or conditions for the dismissal.

My advise to you and Prashanth is moderate.


Best,


Mark